UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| YONEL MAXIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03003-JRS-MPB |
| | ) | |
| KERRY FORESTAL, | ) | |
| BEN LOUZON, | ) | |
| JOSE QUINONES, | ) | |
| JAMES ELLIS, | ) | |
| JASON LAKAS, | ) | |
| JOSHUA JORDAN, | ) | |
| TYLER MCCARTHY, | ) | |
| JUSTIN LAMB, | ) | |
| JASON CARNES, | ) | |
| MICHAEL JABKIEWICZ, | ) | |
| ROBERT AMOS, | ) | |
| SMITH, | ) | |
| SHANIKA BULLOCK, | ) | |
| CHAD MEEKS, | ) | |
| JAMES KOERS, | ) | |
| COX, | ) | |
| DEIDRE BAKER, | ) | |
| | ) | |
| Defendants. | ) | |

## Order on Motion for Summary Judgment

Plaintiff Yonel Maxis, by his next friend Getro Richemond,[1] sued numerous state

officials in connection with his July 2017 arrest and detainment at the Marion County

Jail. Maxis brought suit under 42 U.S.C. § 1983, alleging claims of excessive force,

failure to intervene, *Monell* liability, and deliberate indifference to his medical

---

[1] Maxis experienced a stroke and is unable to participate in his case. (Eichenberger Aff. ¶¶ 5, 9, ECF No. 69-3.) The Court granted his Motion to Substitute Getro Richemond As Next Friend. (ECF Nos. 69, 75.)

condition. The deliberate indifference claim and the Defendants associated with that claim were previously dismissed. (ECF Nos. 90, 99.) Currently before the Court is the remaining Defendants' Motion for Summary Judgment, (ECF No. 92), which the Court grants in part and denies in part.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). And here, the Court is mindful that the "fact-intensive nature" of excessive force cases "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," so summary judgment in such cases "should be granted sparingly." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)).

## Discussion

Maxis is originally from Haiti and speaks Haitian Creole—although the precise extent of his English capabilities is a point of contention throughout this case.

Because Maxis's English capabilities, and Defendants' reasonable perception of those capabilities, bears on the reasonableness of the force used against Maxis, the Court addresses the issue at the outset.

To prevail on an excessive force claim, Maxis must show that the force purposely or knowingly used against him was "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).[2] Objective reasonableness turns on "the facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A non-exhaustive list of considerations that may bear on the reasonableness of the force include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396). The Court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

---

[2] Defendants frame their arguments under the assumption that Maxis was an arrestee within the meaning of the Fourth Amendment, and Maxis frames his as if he were a pretrial detainee under the Fourteenth Amendment. Either way, the standard is the same. *See, e.g.*, Federal Civil Jury Instructions of the Seventh Circuit, 7.09 Fourth Amendment and Fourteenth Amendment: Excessive Force Against Arrestee or Detainee- Elements (Aug. 2017 ed.).

Further, "a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer," as officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* (citing *Graham*, 490 U.S. at 397). Here, that knowledge includes what the Defendants knew and perceived about Maxis's English capabilities. *See, e.g.*, *Burton v. City of Zion*, 901 F.3d 772, 780–83 (7th Cir. 2018) (officer's knowledge that plaintiff had previously been subjected to excessive force was relevant to reasonableness inquiry, as it explained why plaintiff acted the way she did); *see also id.* (giving example that if officer tackled suspect he knew was deaf, that use of force could be excessive given that officer knew the suspect could not respond to his order because they could not hear it).

Maxis lived in a Haitian community in Florida before his arrest, could "drop some words" in English but does not speak English, and does not understand English. (Richemond Aff. ¶¶ 2–3, ECF No. 100-1.; Richemond Dep. 16, ECF No. 100-5.) Before Maxis lost the ability to speak, he told Richemond that he had a language barrier at the jail and could not understand what was being said to him. (Richemond Dep. 46, ECF No. 100-5.) The nurse who completed an initial screening of Maxis at the arrestee processing center used the language line, which allows the user to access a translator by phone, to do so; she testified that she recognized Maxis did not speak English. (ECF No. 100-6 at 2; Morris Dep. 18, ECF No. 100-7.) Other staff also recognized that Maxis could not speak or understand English. (*See, e.g.*, ECF No. 100-9 at 2 (pre-segregation health assessment indicating Maxis "speaks no English"));

(ECF No. 100-10 (nursing progress note indicating "[l]anguage barrier prevented communicating simple commands causing subject to become agitated and resistive")); (ECF No. 100-8 (record indicating that Lieutenant Kriech advised Defendant Amos that Maxis and his friend, Yoovens Dextra, "speak Haitian, and understand little to no English" and that Kriech "informed [Amos] of a [Marion County Sheriff's Office] Deputy that may be able to assist in the communication process").) With this in mind, the Court turns to the facts of each incident.

## A. Incident One: Defendants Louzon, Quinones, Ellis

### 1. Background

The first incident stems from Maxis's transport to the Marion County Jail after he and his friend, Yoovens Dextra, were arrested for trying to board a bus at a traffic light rather than a designated bus stop. (ECF No. 100-3 at 1.) Evidently, Maxis and Dextra were taken to an arrestee processing center. While there, Defendant Louzon interacted with Maxis and "thought perhaps there was a language issue." (Louzon Interrog. ¶ 10, ECF No. 100-21.) Similarly, Defendant Quinones became aware of the language barrier "as soon as" Maxis entered the arrestee processing center search room. (Quinones Interrog. ¶ 10, ECF No. 100-20.)

The use of force occurred as Louzon was trying to place Maxis into a transport wagon to be transported from the processing center to the Jail. (ECF No. 92-5 at 3–4.) Maxis's hands were cuffed behind his back, and he was chained to other detainees. (Louzon Dep. 53–54, ECF No. 100-22.) Louzon ordered Maxis multiple times to slide further into the wagon, but Maxis did not. (*Id.* at 52–53.) As of this point, Maxis had

not done anything physical toward Louzon or any other officers. (*Id.* at 73.) Louzon used his radio to call for assistance in getting Maxis into the wagon. (*Id.*) Defendant Ellis arrived within a minute, and Louzon and Ellis then "grabbed" and "began pushing" Maxis, which led Maxis to push back and try to get out of the wagon. (*Id.* at 53, 74; ECF No. 92-5 at 4.) Maxis was able to jump out of the wagon, causing another inmate to "freak out" and try to get out of the wagon; deputies were able to secure that inmate in the wagon. (ECF No. 92-5 at 4.) Defendants then grabbed Maxis and lifted him back into the wagon, but he continued to push back and fight them, causing his friend, Dextra, also to "freak out" and refuse to get into the wagon. (*Id.*) Deputies were able to get Maxis and Dextra into the wagon, but the two then kicked their legs to prevent the wagon doors from closing. (*Id.*) At that point, Louzon and Quinones used their tasers multiple times on Maxis and Dextra, "until compliance was reached" and the doors could be closed. (*Id.*) Maxis was tased at least four times and possibly more. (ECF No. 100-24; ECF No. 100-25 at 13; Pl.'s Resp. 19, ECF No. 100.)

2. Excessive-Force Claim

The Defendants involved in this incident assert that their use of force was reasonable and that, in any event, they are entitled to qualified immunity. A state official is protected by qualified immunity unless the plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018) (quoting *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017)). The

Court has "discretion to choose which prong to address first." *Id.* (quoting *Mason-Funk v. City of Neenah*, 895 F.3d 504, 507–08 (7th Cir. 2018)). Because the question of whether the right was clearly established is dispositive here, the Court turns to it first. *See id.*

A case "directly on point" is not required for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). Defining the clearly established right with specificity is "especially important" in excessive force cases, where "it is sometimes difficult for an officer to determine" how the legal doctrine of excessive force "will apply to the factual situation the officer confronts." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela*, 138 S. Ct. at 1153).

Maxis cites several cases he believes establish that Defendants' use of force was excessive. He cites important principles underlying the Seventh Circuit's holdings in those decisions: the use of force should not be exaggerated or excessive, it should generally follow adequate warnings, and significant force cannot be used on a passively resisting individual. However, those cases are sufficiently distinguishable from the situation here. While the "very action in question" need not have been previously held unlawful, the right must be clearly established "in a particularized sense" such that "a reasonable officer would have known that the particular action at issue" was unlawful. *Lewis v. Downey*, 581 F.3d 467, 478–79 (7th Cir. 2009) (quotations omitted). That standard is not satisfied here.

Maxis first cites *Lewis*, in which the Seventh Circuit held that an officer was not entitled to qualified immunity after he tased an inmate he believed was at risk of suicide. *Lewis*, 581 F.3d at 471, 479. The inmate was lying on his cell bunk, weak from a hunger strike and sick from ingesting medicine. *Id.* at 471. The officer ordered him off the bed, but before the inmate could explain why he could not comply, and without further provocation or a warning that a taser would be used, the officer fired his taser. *Id.* at 417, 479. The *Lewis* court cited *Soto v. Dickey*, 744 F.2d 1260, 1270–71 (7th Cir. 1984), which held that the use of chemical agents like tear gas and other similar means could be appropriate under the Eighth Amendment if such use was necessary, not "exaggerated or excessive," and generally followed "adequate warning[s]." *Lewis*, 581 F.3d at 479. But since Lewis was not recalcitrant and was given a single order with no time to comply and no warning of the repercussions of noncompliance, "no reasonable officer would think that he would be justified in shooting Lewis with a taser gun." *Id.*

Maxis also cites *Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010), for the proposition that a warning should be given. There, the court distinguished *Lewis* and concluded that the officer's use of a taser was a permissible use of force. *Id.* at 745. Whereas Lewis was merely "slow to comply with an order," the detainee in *Forrest* was belligerent and intoxicated; was a "relatively large man" confined in a relatively small space; was pacing in his cell, clenching his fists, and yelling obscenities; had required the use of a taser during his arrest after attacking an officer; and was warned "several times" that noncompliance with orders would result in tasing but "did not heed the

warnings." *Id.* at 741–42, 745. Because he "posed an immediate threat to safety and order within the jail," use of the taser was permissible. *Id.* at 745.

Finally, Maxis references *Phillips v. Community Insurance Corp.*, 678 F.3d 513 (7th Cir. 2012). There, the court denied qualified immunity to officers who used a semi-automatic firearm that fires polyurethane bullets to shoot four times a drunk driver who did not comply with orders to exit her car. *Id.* at 517–18. The court concluded that in light of precedent, it was clearly established that "officers could not use a significant level of force on a nonresisting or passively resisting individual." *Id.* at 529; *see also id.* (citing *Smith v. Ball State University*, 295 F.3d 763, 771 (7th Cir. 2002), as indicating that "only minimal force was warranted to remove a driver perceived to be intoxicated and passively resisting").

The Court does not agree that these cases put Defendants on notice that their "particular action[s] at issue" were unlawful. *Lewis*, 581 F.3d at 478–79. *Lewis* and *Phillips* involved immediate significant force against individuals who were not resisting or were passively resisting. The officer in *Lewis* immediately tased a nonresisting, recumbent inmate housed in a cell, with no warning and after no opportunity to comply was given. And the *Phillips* officers fired four polyurethane bullets at a drunk driver who was lying down in her car. That is significantly different from the situation here, where Defendants, while trying to transport a chain of detainees to jail, first "began pushing" Maxis to try and get him in the transport wagon, (Louzon Dep. 74, ECF No. 100-22; ECF No. 92-5 at 4), at which point the scene turned chaotic: Maxis pushed back and jumped out of the wagon, which caused two

other inmates chained to Maxis to "freak out." (ECF No. 92-5.) When Defendants were able to secure all the inmates in the wagon, Maxis and Dextra kicked their legs to prevent the doors from closing, at which point Defendants deployed the taser in order to close the doors. (*Id.*) At that point, Maxis was not a nonresisting or passively resisting individual, like Lewis or Phillips; he does not dispute that he was pushing back and kicking his feet to keep the transport doors from closing, and "kicking and flailing" constitutes active resistance. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (quoting *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011)). "[A]n officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable." *Id.* (citing *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 723–24 (7th Cir. 2013)); *see also Abbott*, 705 F.3d at 728 (officer "did not violate clearly established law" by using taser "several more times" until plaintiff was subdued insofar as plaintiff "continued to resist after the first tasing"); *Smith*, 295 F.3d at 770 (citing *Graham*, 490 U.S. at 396–97) ("When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them."). Similarly, while *Forrest* noted the importance of the officer's repeated warnings that a taser would be used, the plaintiff was a detainee housed alone in a cell, not a detainee chained to other detainees who were "freaking out" when being placed in a transport vehicle—in other words, the officer in *Forrest* had time to issue the warnings. *Forrest* does not establish "beyond debate" that use of a taser or other

significant force is excessive if a warning and opportunity to comply are not given in the sort of rapidly evolving situation present here.

"Qualified immunity protects an officer from liability if a reasonable officer could have believed that the action taken was lawful, in light of clearly established law and the information the officer possessed at the time." *Phillips*, 678 F.3d at 527–28 (citing *Omdahl v. Lindholm*, 170 F.3d 730, 733 (7th Cir. 1999)). *Lewis*, *Soto*, *Forrest*, *Phillips*, and *Dockery* do not clearly establish that Defendants' conduct was unlawful. Even assuming Defendants knew Maxis could not understand their commands, it is not clearly established that using minimal force—here, pushing—against an individual, and then increasing that force to use of a taser, without warning, when that individual pushed back, kicked, and refused to be transported to jail, violated a constitutional right.[3] Defendants are entitled to qualified immunity as to Count I.

    3. <u>Failure-to-Intervene Claim</u>

Maxis also brings a failure-to-intervene claim against Defendants Louzon, Ellis, and Quinones, contending that they failed to intervene to stop or prevent the application of excessive force. (Compl. ¶¶ 172–80, ECF No. 1.) An officer "who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable" if the officer "had reason to know" that excessive force was being used and "had a realistic opportunity to

---

[3] And while Seventh Circuit law "holds that use of unnecessary force on one who resists only that force can constitute excessive force," *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 727 n.4 (7th Cir. 2013), the "push" that Maxis "resisted" initially was not excessive or unnecessary. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

11

intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

However, the Seventh Circuit has held that when the underlying constitutional right is not clearly established, the officials "would not have known a constitutional violation was committed, and therefore, cannot be liable for failure to intervene." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (holding that since defendant was entitled to qualified immunity because the constitutional right was not clearly established, the corresponding claim for failure to intervene "must also fail"); *see also Leiser v. Kloth*, 933 F.3d 696, 705 (7th Cir. 2019) (citing *Gill* to conclude that failure-to-protect claim failed because the constitutional right was not clearly established). Here, because Maxis's right to be free from the force used by Defendants in the first incident was not clearly established, the Defendants cannot be liable for failure to intervene. Therefore, Defendants Louzon, Ellis, and Quinones are entitled to summary judgment as to Count II.

**B. Incident Two: Defendants McCarty, Lamb, Jordan, Lakas**

1. <u>Background</u>

The next incident took place while Maxis was housed in a cell at the Jail. (Berthelette Dep. 18, ECF No. 100-11.) Deputy Berthelette offered Maxis a tray of food "to the best of [his] ability" because Berthelette was not sure if Maxis understood what Berthelette was saying. (*Id.*) Maxis then "flipp[ed]" or threw the tray at Berthelette but did not make contact with him. (*Id.* at 24; ECF No. 92-14.) The

remaining details are taken largely from a report documenting the incident. (ECF No. 92-14.) The report states that Maxis then picked up the food and began throwing it. (*Id.*) It further states that Maxis caused his friend and fellow detainee, Yoovens Dextra, to yell and scream and become agitated in a nearby cell, (*id.*), although Berthelette testified that he did not remember that happening, (Berthelette Dep. 24, ECF No. 100-11). Defendant Jordan was called to the area. (ECF No. 92-14.) He tried to speak with Maxis but was unable to communicate with him "due to [the] language barrier." (*Id.*) Jordan then called Defendant Lakas to the area. (*Id.*) Lakas tried to get Maxis "to understand the request" to turn around and be placed into handcuffs, but Maxis "refused" to "comply with orders." (*Id.*) "Due to [Maxis's] agitation, and him causing other inmates on the floor to become agitated," Jordan and Lakas "decided that it would be better to place [Maxis] in a holding cell on a different floor." (*Id.*) Maxis's cell door was opened, and Defendants Jordan, McCarty, Lamb, and Dillihey entered the cell. (*Id.*) McCarty "grabbed" Maxis "by the shirt sleeves and took him to the ground." (*Id.*) When on the ground, Maxis started to kick his legs and would not allow his arms to be handcuffed. (*Id.*) Lamb "gave two common peroneal strikes" to Maxis's leg as McCarty pulled one of Maxis's arms, but Maxis still would not surrender his arms, so Lamb struck Maxis's leg a third time. (*Id.*) At that time, Defendants were able to secure Maxis's arms and place him in handcuffs. (*Id.*) Whether Maxis suffered any injury as a result is unclear, as nursing staff "was called to assess" him, but Maxis was "noncompliant and refused to let" the staff evaluate him. *Id.*

2. <u>Excessive Force and Qualified Immunity</u>

A reasonable jury could find that Defendants' use of force in this incident was unreasonable. The Court is appropriately deferential to Lakas and Jordan's determination that Maxis needed to move cells to "preserve internal order and discipline and to maintain institutional security.'" *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). But "[e]ven when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands." *Phillips*, 678 F.3d at 527. And "[t]here is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity. An arrestee may be physically unable to comply with police commands." *Id.* at 526. Or, as here, an arrestee may be unable to understand police commands in order to comply. Defendants knew this—they documented as much in the incident report—but nevertheless, four officers entered the cell, "grabbed" Maxis "by the shirt sleeves and took him to the ground," then struck him three times while pulling on his limbs. (ECF No. 92-14.) Despite knowledge of the language barrier, Defendants did not attempt to use the Jail's language line or arrange for a translator, which would have been efforts "to temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). And while Maxis may have been actively resisting when he was throwing food, *Dockery*, 911 F.3d at 467 (citing *Forrest*, 620 F.3d at 745–46) (stating that "declining to follow instructions while acting in a belligerent manner" constitutes active resistance), "active resistance at some point prior to an officer's

deployment of force does not necessarily make the use of such force reasonable under the circumstances if the suspect is passively resisting when force is deployed," *Ferguson v. McDonough*, 13 F.4th 574, 583 (7th Cir. 2021). It is not entirely clear what the scene looked like when the force was deployed. The incident report does not state that Maxis was still throwing food or otherwise acting belligerently at that time. And enough time had passed for both Jordan and Lakas to come to the scene, in successive fashion, and try to communicate with Maxis. In short, it may have been unreasonable for Defendants to use the force they did against an inmate they knew could not understand them—or at minimum, it may have been unreasonable for Defendants to think that he could understand them—if that inmate was not resisting at the time.

However, the right to be free from this type of force was not clearly established. The law is clearly established that officers cannot use "significant" force on individuals who are not resisting or are only passively resisting. *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (citing *Abbott*, 705 F.3d at 732). Taking the facts and drawing inferences in the light most favorable to Maxis, at the time the force was used, he was not resisting—he just didn't understand Defendants' commands. Even so, it wasn't clear that Defendants used "significant" force. Cases in which the Seventh Circuit has held that officers used "significant" force involved force that was more obviously significant than what was used here: a semi-automatic firearm that fired polyurethane bullets with force equivalent to that of a .44 magnum pistol, *Phillips*; a Taser, *Lewis*; deliberately bringing a knee into a suspect's face with enough

force to break his jaw, *Miller*; or situations not involving such obvious force, but where the individual had effectively not done anything wrong or had indicated an intent to cooperate: grabbing an arrestee and throwing him to the floor when he "was docile and cooperative," "did not resist in any way," and had informed officers he was "going peacefully," *Morfin v. City of East Chi.*, 349 F.3d 989, 1005 (7th Cir. 2003); or a "wholly gratuitous" shove of a handcuffed arrestee into a squad car "without any provocation whatsoever" and after the arrestee had asked if he could get into the car himself, *Clash v. Beatty*, 77 F.3d 1045, 1047–48 (7th Cir. 1996). This case falls somewhere in the middle: some force may have been required to maintain institutional security, unlike in *Morfin* or *Clash*, but less force was also employed here than in *Phillips*, *Lewis*, or *Miller*. The situation here is comparable to *Forrest*, where the use of a taser to quell a belligerent, aggressive detainee who "posed an immediate threat to safety and order within the jail" was permissible. 620 F.3d at 745. *Forrest* is distinguishable in notable ways—the detainee there was belligerent and aggressive at the time force was used, which Maxis may not have been, and he was warned that the taser would be used, which Maxis was not—but Defendants also used less force than in *Forrest*. All that is to say, "pre-existing law" did not make the unlawfulness of Defendants' actions "apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Of course, "the very action in question" need not have previously been held unlawful, *Lewis*, 581 F.3d at 478–49 (quoting *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992)), but "the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene

judgments about the level of necessary force,'" *Dockery*, 911 F.3d at 467 (quoting *Abbott*, 705 F.3d at 725), and the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739 (quoting *Anderson*, 483 U.S. at 640); *Lovett*, 907 F.3d at 992 (cleaned up) (determining whether a right is clearly established must be done "in light of the specific context of the case;" such specificity "is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts"). The contours were not sufficiently clear here, so Defendants are entitled to qualified immunity on Count III.

### 3. Failure to Intervene

As with the first failure-to-intervene claim, because Maxis's right to be free from the force used by Defendants was not clearly established, Defendants cannot be liable for failure to intervene in this incident. *Gill*, 850 F.3d at 342; *Leiser*, 933 F.3d at 705. Defendants are entitled to summary judgment on Count IV.

## C. Incident Three: Defendants Carnes, McCarty, Jordan, Jabkiewicz

### 1. Background

The next incident occurred the day after the incident involving the food tray. Defendants McCarty, Jordan, and Carnes prepared to escort Maxis to another cell for suicide observation. (ECF No. 92-15.) McCarty told Maxis to stand up and place his hands behind his back so he could be handcuffed, but Maxis remained seated on his

bunk and did not comply. (*Id.*) Lieutenant Lakas was called to the scene. (*Id.*) McCarty then repeated the verbal command, but also used hand gestures to attempt to communicate. (*Id.*) Maxis "continued to refuse" to comply and shook his head and stated "no." (*Id.*) Another verbal command was given, but Maxis did not comply. (*Id.*)

At that point, Lakas decided the team should enter the cell. (*Id.*) McCarty and Carnes entered the cell, and Maxis stood up. (*Id.*) "Maxis was placed onto the ground face down."[4] (*Id.*) Maxis was instructed to place his hands behind his back but kept his arms below his stomach. (*Id.*) Carnes applied pressure to Maxis's right mandibular angle, and Maxis's arms were able to be placed behind his back so he could be handcuffed. (*Id.*)

Maxis was then escorted to a new cell, where he was "placed" "face down on his bunk." (*Id.*) Due to suicide precaution protocols, Maxis's pants and vest needed to be removed. (*Id.*) As Carnes was trying to remove Maxis's pants, Maxis began tensing his arms and kicking his legs. (*Id.*) Jordan then gave three to four closed fist strikes to Maxis's left common peroneal nerve, and Carnes was able to remove the pants.

---

[4] Maxis's brief characterizes this as "throwing him onto the ground face down." (Pl.'s Resp. 22, ECF No. 100.) However, that is not what the evidence—here, the incident report—shows. Without supporting evidence beyond this statement in Maxis's brief, there cannot be a genuine dispute as to how much force was applied. *See* Fed. R. Civ. P. 56(c) (a party asserting that a fact is genuinely disputed must support the assertion by citing to materials in the record). Even if the Court were to consider that Maxis cannot testify and therefore heed his request to "scrutinize all the evidence to determine whether the officers' story is consistent with other known facts," *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020) (citing *Maravilla v. United States*, 60 F.3d 1230, 1233–34 (7th Cir. 1995)), there is no other evidence to scrutinize. For example, there is no evidence that Maxis sought medical attention after the incident for injuries to his face, which might suggest more force was used than Defendants admitted in the incident report.

(*Id.*)  Maxis continued kicking his feet and tensing his arms as Carnes tried to remove the vest, so Carnes applied pressure to Maxis's right mandibular angle.  (*Id.*) Defendant Jabkiewicz then entered the cell and held Maxis's legs. (*Id.*)  The vest was removed, and Defendants removed the handcuffs and exited the cell.  (*Id.*)

## 2. Excessive Force

Defendants' use of force in this incident was not excessive.  Defendants had a reasonable belief that Maxis understood their commands and chose not to comply.  It is true that Lakas was involved in, and McCarty had completed the incident report for, the food tray incident, where it was documented that there was "a language barrier" when trying to communicate with Maxis.  (ECF No. 92-14.)  However, here, McCarty used hand gestures to attempt to communicate, and Maxis shook his head and stated "no."  (ECF No. 92-15.)  As Maxis states, this could "just as easily mean" that he was saying "no" because he did not understand, as opposed to saying "no" to indicate he understood and chose not to comply.  (Pl.'s Resp. 22, ECF No. 100.)  But the touchstone of the use of force is reasonableness, and it was reasonable for Defendants to believe Maxis understood their commands and refused to comply, given that McCarty used hand gestures and Maxis responded "no."  *See Phillips*, 678 F.3d at 520 (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)) ("Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide.").

Given this belief, Defendants proceeded to act reasonably.  The Parties do not offer evidence or case law that speaks to how forceful the techniques used here are.  But

in *Padula v. Leimbach*, 656 F.3d 595, 603–04 (7th Cir. 2011), the Seventh Circuit held that officers were "entitled to forcibly remove" from his car an individual they reasonably believed was intoxicated after "he did not comply with their command to get out on his own." The court further held that in light of the individual's physical resistance—the individual resisted officers' attempts to handcuff him and kicked and flailed his arms—that the officers' use of mace, baton strikes, and holding the individual in a prone position were reasonable. *Id.* Specifically, the three baton strikes were "appropriate in response to [the individual] kicking and flailing his arms," and the third strike was used only because the first two did not enable the officer to secure the individual's leg to prevent him from kicking. *Id.* Here, Defendants' physical control, strikes, and use of pressure techniques appear comparable to the force used in *Padula*. To be sure, using the language line or calling a translator would have been one effort "to temper or to limit the amount of force," especially since Maxis's clothing was going to be removed. (*See* Dietz Aff. 16, ECF No. 91-1.) But "a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley*, 576 U.S. at 399–400. Jail staff had determined that Maxis needed to be moved for suicide observation. While Lakas and McCarty knew about the language barrier from the food tray incident, they also thought that Maxis could understand them based on the use of hand gestures and his response, "no." *See Phillips*, 678 F.3d at 523 (citation omitted) (noting it is "not objectively reasonable to

ignore specific facts as they develop . . . in favor of prior general information about a suspect").  Accordingly, they used a limited amount of force to accomplish the objective.  When considering the totality of the circumstances, Defendants acted reasonably.

### 3. Failure to Intervene

"[B]y definition, if there is no excessive force then there can be no failure to intervene." *Turner v. City of Champaign*, 979 F.3d 563, 571 (7th Cir. 2020) (quoting *Abdullahi*, 423 F.3d at 767–68).  Accordingly, Defendants are entitled to summary judgment on the failure-to-intervene claim in Count VI.

## D. Incident Four: Defendants Amos, Bullock, Cox, Meeks, Koers, Smith

### 1. Background

When the final use of force took place, Maxis was housed in a suicide prevention cell.  (Baker Decl. ¶¶ 4, 6, ECF No. 92-6.)  Individuals are not permitted to have personal items in these cells, so the Styrofoam cup Maxis had used during his meal needed to be returned.  (*Id.*)  The rationale behind this policy is twofold: inmates might use the cup as a choking device to harm themselves, or they might use it as a vehicle to throw urine or feces on jail staff or other inmates.  (Amos Dep. 29–30, ECF No. 92-16.)

As Maxis points out, the incident report that Defendant Amos completed shortly after this incident, (ECF No. 100-30), varies in some respects from Amos's later deposition testimony, (ECF No. 92-16), and interrogatory, (ECF No. 100-31).  (*See* Pl.'s Resp. 24–28, ECF No. 100.)  The Court notes these inconsistencies where

applicable.  *See Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014) (whether discrepancy between officer's police report and his affidavit was "further evidence that a jury might use to conclude that [the officer] was manipulating facts to cover up" his use of force or was "merely the result of slightly different wording rather than an actual material discrepancy" was a determination "for a fact-finding jury").

Defendant Amos does not dispute that prior to this incident, he had been told that Maxis and his friend, Dextra, speak Haitian and "understand little to no English," and that there was a Sheriff's Office deputy that "may be able to assist in the communication process."  (ECF No. 100-8.)

The incident report states that Amos asked Maxis to hand the cup over, but Maxis refused to look at Amos.  (ECF No. 100-30 at 1.)  Maxis went to the sink and took a drink.  (*Id.*)  Amos asked again for the cup, and Maxis "refused" and took another drink from the sink.  (*Id.*)  Amos asked a third time for the cup, but Maxis "remained uncooperative."  (*Id.*)  In his deposition, however, Amos testified that when he told Maxis he needed the cup, Maxis said "no," filled up the cup, looked at Amos "almost in defiance," and took a drink from the cup; when asked for the cup a second time, Maxis again said "no" and filled up the cup and took a drink.  (Amos Dep. 11, ECF No. 92-16.)  Amos's interrogatory goes further, stating that when he asked for the cup, Maxis responded "fuck off."  (Amos Interrog. ¶ 7, ECF No. 100-31.)  Jail policy indicates that an incident report "shall contain" an account of the events leading to the use of force and an accurate description of the incident and reasons for the use of force.  (ECF No. 100-19.)  Major and jail commander Tanesha Crear testified that if

an inmate told an officer they would not comply with commands, that should be noted in the report, as should any language barrier, and that she would expect an inmate's cursing at an officer to be noted as well. (Crear Dep. 61, 66–67, 69, ECF No. 92-8.)

After this back-and-forth, Amos left the area and contacted Captain Baker to secure approval to assemble a critical response team to extract the cup from the cell, (ECF No. 100-30 at 1), although he did not mention the language issue when securing approval, (Baker Dep. 58, 63, ECF No. 100-28). Amos gathered the team and assigned an officer to video the incident. (ECF No. 100-30 at 1; *see* Video, ECF No. 92-17.) Amos returned to Maxis's cell and asked him to return the cup. (ECF No. 100-30 at 1.)

As seen in the video, Maxis is seated on his bunk, looking away from the cell door where Amos is located, and does not respond. (*Id.*; ECF No. 92-17.) Amos demands the cup two more times and indicates that force will be used if Maxis does not comply. (ECF No. 92-17.) Maxis does not respond or look in Amos's direction. (*Id.*) The cell door is slid open and five deputies—Defendants Bullock, Cox, Koers, Meeks, and Smith—enter the cell in tactical gear and with a shield. (ECF No. 100-30 at 1; Video, ECF No. 92-17.)

Due to the number of deputies in the cell, it is difficult to discern from the video precisely what is happening; the remaining details are taken from the incident report. Maxis is pushed down onto his bunk with the shield, but "turned sideways" and grabbed the shield. (ECF No. 100-30 at 1.) Maxis is ordered to let go of the shield and lay on his stomach but does not, instead wrapping his legs around Defendant

Cox's legs. (*Id.*) Maxis "continued to fight" the deputies. (*Id.*) Defendant Smith delivered three strikes to Maxis's forearm, but due to the forearm's position, Smith "was not able to deliver effective strikes." (*Id.*) Defendant Cox then delivered three strikes to Maxis's common peroneal nerve in the upper right thigh and commanded Maxis to let go of him. (*Id.*) Defendant Meeks then "pressed into [Maxis's] mandibular angle located behind the ear and jaw." (*Id.*) Maxis "continued to fight" with Defendants and "would not release his hold on the shield or on Cpl. Meeks['] leg." (*Id.*)

Amos then entered the cell, called out "taser, taser, taser" and tased Maxis in his lower back and hamstring for five seconds. (*Id.*) Despite Defendants' commands, Maxis still refused to let go of the shield, so Amos deployed his taser a second time. (*Id.*) After Maxis would not comply with commands, Amos then tased Maxis a third time, on the inner thigh, and Maxis let go of the shield. (*Id.*) The shield and cup were removed from the cell, and Maxis was handcuffed. (*Id.*)

     2. <u>Excessive Force and Qualified Immunity</u>

It is the "totality of the circumstances" that determines the reasonableness of the force used. *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) (chiding district court for "consider[ing] each aspect of force used separately" and concluding that "[u]nder the facts as a whole" the use of force was unreasonable); *but see Dockery*, 911 F.3d at 467 (noting that "[i]n some cases each discrete use of force must be separately justified" and concluding that a "sequential analysis" was appropriate).

"[F]orce is reasonable only when exercised in proportion to the threat posed." *Phillips*, 678 F.3d at 525 (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)). A reasonable jury could find that this use of force exceeded any threat Maxis may have posed. The Court is mindful of Defendants' need to "manage the facility" and their judgment that confiscation of Styrofoam cups is "needed to preserve internal order and discipline." *Kingsley*, 576 U.S. at 397. But "[e]ven when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands." *Phillips*, 678 F.3d at 527. The evidence shows Maxis sitting on a bunk in his cell, looking away from Defendants. Amos testified that at that point, Maxis had not threatened anyone, verbally or physically attacked anyone, made any intent to inflict any harm on himself or anyone else, or made any threatening gestures whatsoever—in other words, "the threat reasonably perceived by the officer" was incredibly minimal. (Amos Dep. 61, ECF No. 92-16.) In that same vein, "the severity of the security problem at issue" was very minor. In fact, it was minor enough for Amos to leave the scene—while the cup remained in Maxis's cell—for approximately thirty minutes to devise a plan, and Maxis did nothing during that time to suggest that security was at risk. (Amos Dep. 11–12, ECF No. 92-16.)

A reasonable jury might be inclined to disbelieve Amos's story about what Maxis said and did, given the changes in Amos's story. *See Miller*, 761 F.3d at 828. But even if Maxis did understand Amos's orders and did respond "no," that still would have constituted passive resistance warranting a minimal use of force. And while

Amos gave repeated demands for the cup and warned that force would be used—although warnings and commands like these are useless for a detainee who cannot understand them—he did not attempt to arrange for an interpreter or call for the deputy whom he had been told could translate, efforts that could have been made to "temper or to limit the amount of force."  While nurses assessed Maxis and cleared him of any further medical needs, (ECF No. 100-30), "[t]he absence of significant injury will not defeat a claim of excessive force;" injury is just one factor in the reasonableness inquiry.  *Williams v. Stauche*, 709 F. App'x 830, 834–35 (7th Cir. 2017) (citing *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).  In sum, a reasonable jury could find that the amount of force used was disproportionate to the need to confiscate the cup.  That is true when considering the totality of the force used under "the facts as a whole," *Becker*, 821 F.3d at 928, which consisted of five officers in tactical gear pushing Maxis down with a riot shield, use of numerous strikes and pain-compliance techniques, and three taser jolts.  It is also true if a "sequential analysis" were appropriate, *Dockery*, 911 F.3d at 467, as the deployment of the critical response team in the first place could be found unreasonable, and the "use of unnecessary force on one who resists only that force," as Maxis resisted the team's use of the riot shield, "can constitute excessive force."  *Abbott*, 705 F.3d at 727 n.4 (citing *Morfin*, 349 F.3d at 1005).  Indeed, Major Baker testified that forcing Maxis down with the shield escalated the situation, and that simply walking in with the shield to grab the cup, then walking out, would have been a better plan.  (Baker Dep. 77–78, ECF No. 100-28.)  She also testified that, assuming Maxis did not understand the commands, the

total amount of force used in this incident was excessive in relation to the goal of removing the cup. (*Id.* at 98.) This only confirms the Court's conclusion that there are genuine disputes of material fact rendering summary judgment inappropriate. A jury has to resolve whether Maxis understood the commands, whether it was reasonable for Amos to believe that Maxis understood them, and ultimately, whether the use of force was reasonable.

Defendants counter that sending in the critical response team was reasonable because Maxis's "decision to sit on the bunk and not look at the deputies when they asked, on video, for him to return the cup was more than just being passive." (Defs.' Br. 18, ECF No. 94.) They stress that Maxis "was asked several times and given plenty of opportunity to comply" but his reaction shows that he "simply did not want to comply with orders and was itching for another confrontation." (*Id.*) This position is untenable under the Seventh Circuit's definition of passive resistance. *See Phillips*, 678 F.3d at 524–25 (even if arrestee heard officers' orders and chose not to obey, it would have constituted "passive noncompliance of a different nature than the struggling that we have found warrants escalation of force"); *id.* (discussing *Smith v. Ball State University*, 295 F.3d 763, 767 (7th Cir. 2002), and noting that "what the officers perceived as willful noncompliance was not the same as 'actively resisting' but instead a passive 'resistance *requiring the minimal use of force*'"); *Rambo v. Daley*, 68 F.3d 203, 205–07 (7th Cir. 1995) (arrestee's refusal to enter squad car was "passive"); *cf. Dockery*, 911 F.3d at 467 (citing cases and giving as examples of active resistance "kicking and flailing," "declining to follow instructions while acting in a

belligerent manner," and "swatting an arresting officer's hands away while backpedaling"); *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) (citing *Phillips*, 678 F.3d at 525) (even if arrestee had heard officer's command, his failure to comply would have been passive noncompliance).

Defendants also claim that Amos was entitled to consider all of Maxis's prior "violence and resistance," beginning from Maxis's resistance of arrest. (Defs.' Br. 18, ECF No. 94; Defs.' Reply 15, ECF No. 106). True, but that does not give Amos a free pass to use unnecessary, excessive force throughout Maxis's detainment: the "prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Miller*, 761 F.3d at 829.

For these same reasons, Defendants are not entitled to qualified immunity. Seventh Circuit case law "has long put police officers on notice" that "significant force is unreasonable after a suspect is subdued or has stopped resisting or evading arrest or is, at most, passively resisting arrest." *Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021) (citing *Miller*, 761 F.3d at 829); *see also Abbott*, 705 F.3d at 732 (citing cases); *Morfin*, 349 F.3d at 1005 (reversing summary judgment for officers where "[i]t was only after the officers took [plaintiff] to the floor that [he] crossed his arms on his chest to prevent the officers from handcuffing him"); *Dockery*, 911 F.3d at 467 (quoting *Abbott*, 705 F.3d at 732) ("[A]n officer may not use significant force (like a Taser) against a 'nonresisting or passively resisting' subject."); *Becker*, 821 F.3d at 928–29 ("[I]t was clearly established that only minimal force is warranted where the

accused is passively resisting."); *Lewis*, 581 F.3d at 477 ("In cases upholding the use of taser guns, the victims have been violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others;" no "aggressive or threatening behavior" that would warrant use of a taser when weak and sluggish inmate was "lying on his bunk").

Defendants argue that *Scaife v. Faivre*, No. 17 C 8946, 2019 WL 5695826 (N.D. Ill. 2019), suggests their use of force was reasonable. This argument can be dismissed summarily: the detainee there "was not a mere passive resister; he was actively resisting the effort to move him out of the cell." *Id.* at *3. Maxis was, at most, passively resisting at the onset. And even then, the *Scaife* officers used significantly less force than Defendants did here. It was clearly established that Defendants could not use such a significant level of force on a nonresisting or passively resisting individual. Defendants are not entitled to summary judgment on Count VII.

### 3. Failure-to-Intervene Claim

For similar reasons, Defendants are not entitled to summary judgment on Count VIII's claim for failure to intervene. "An officer presented with a realistic opportunity to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 for failing to act if the officer had reason to know" that "excessive force was being used." *Timas v. Klaser*, 23 F. App'x 574, 579 (7th Cir. 2001).

Maxis was sitting on his bunk, looking away from Defendants, when five officers in tactical gear entered the cell with a riot shield. All Defendants knew the plan—

including Baker, who was not on the scene but authorized the plan—and any one of them could have recognized that the plan would result in excessive force and could have suggested a different approach, yet none did. *Abdullahi*, 423 F.3d at 774 (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)) ("[A] 'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop.'"); *see also Morfin*, 349 F.3d at 1001 (emphasis added) (if defendant had knowledge of facts that would cause him to believe that other officer "*was about to*" make an unconstitutional arrest but failed to stop the violation, his failure would result in § 1983 liability). Defendants counter Maxis's failure-to-intervene claims by stating that their use of force was always reasonable. (Defs.' Br. 22, ECF No. 94.) As the Court's prior analysis makes clear, a jury could find otherwise. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer[s] is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). A reasonable jury could conclude Defendants had reason to know excessive force was being used and had an opportunity to intervene and prevent it. And since it was clearly established that Defendants' actions constituted excessive force, thereby triggering the duty to intervene, Defendants are not entitled to qualified immunity. *See Abdullahi*, 423 F.3d at 774–75 (officers not entitled to

qualified immunity when it could have been clear to a reasonable officer that officer's actions constituted unreasonable force, thereby triggering the duty to intervene).

### E. *Monell*

Finally, Maxis asserts a *Monell* claim against the Marion County Sheriff's Office ("MCSO"). To establish liability against MCSO, Maxis must show that an official policy or custom caused, and was the "moving force" behind, his constitutional violations. *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). A plaintiff can demonstrate an "official policy" in different ways, but Maxis attempts to do so by showing that MCSO had a "widespread practice that is so permanent and well-settled that it constitutes a custom or practice." *Id.* (citing *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)). Maxis argues MCSO had a "practice" of punishing non-English-speaking inmates for failing to comply with orders they could not understand, despite having resources like the language line or a translator available. (*See* Pl.'s Resp. 33, ECF No. 100 ("[A] jury could reasonably conclude that the MCSO was deliberately indifferent to the risk that a non-English speaking inmate such as [Maxis] would be repeatedly punished for failing to follow commands he did not understand.").) To succeed on this argument, Maxis must show that MCSO was "deliberately indifferent to a known risk" that the practice would lead to constitutional violations. *Hall v. City of Chi.*, 953 F.3d 945, 950 (7th Cir. 2020).

While the Seventh Circuit has declined to issue any "bright-line rules" as to how frequently conduct must occur to constitute a "widespread custom or practice" and

impose liability, *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), claims of these sort "normally require evidence that the identified practice or custom caused multiple injuries." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (citing *Thomas*, 604 F.3d at 303 ("[T]here is no clear consensus as to how frequently [an injury] must occur to impose *Monell* liability, except that it must be more than one . . . or even three [times.]")); *Thomas*, 604 F.3d at 303 (this requirement is intended to "demonstrate that there is a policy at issue rather than a random event"). Maxis admits that he cannot point to other inmates or detainees who have had similar experiences, but he relies on *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004), as support that he doesn't have to. (Pl.'s Resp. 31–32, ECF No. 100.) However, *Woodward* is readily distinguishable.

*Woodward* held that CMS, a jail's private healthcare provider, could be held liable under *Monell* for its deliberate indifference after a detainee committed suicide. 368 F.3d at 919, 927–30. It is true that *Woodward* rejected the defendant's argument—the same argument MCSO makes here—that the failure to produce evidence of similar incidents was fatal to the plaintiff's effort to prove a custom or practice. *Id.* at 929. But the court noted that suicide was a "highly predictable consequence" of the defendant's systematic failures, and that the defendant's liability was "based on much more than a single instance of flawed conduct, such as one poorly trained nurse." *Id.* Rather, liability was "based on repeated failures to ensure" the inmate's safety "as well as a culture that permitted and condoned violations of policies that were designed to protect inmates" like the plaintiff. *Id.* The key distinction between

*Woodward* and this case is that the defendant in Woodward *knew* that its practice of treating mentally ill inmates "was so inadequate" that it was "on notice" that there was a substantial risk the plaintiff would have his constitutional rights violated.  *Id.* at 927; *see also id.* (quoting *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995)) (emphasis added) ("[M]unicipal liability can also be demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government *was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned*, thus in either event adopting, the misconduct of subordinate officers.'").

CMS knew it didn't adequately train its employees on how to handle potential suicide risks.  *Id.* at 922, 927.  When lower-level employees reported violations of company policies, supervisors "encouraged" those employees to disregard the policies and procedures specifically designed to mitigate the risk of inmates committing suicide.  *Id.* at 922–23.  CMS "condoned the practice" of employees not completing mental health intake forms, and it "knew about and again permitted" the practice that a higher-up did not review those forms.  *Id.* at 927.  The higher-ups "knew of CMS employees' disregard for written policies and yet did nothing to ensure that they followed those procedures."  *Id.* at 928; *see also id.* at 929 ("[T]he deliberate indifference to [the plaintiff's] safety was demonstrated by CMS's condoning of its employees not following policies."); *id.* at 930 ("CMS was on notice that its employees ignored the medical needs of inmates and that such a practice could result in an inmate successfully committing suicide."); *id.* ("CMS's failure to act in the face of

known violations of its written policies" was evidence it had knowledge of a substantial risk).

In contrast, there is no evidence that MCSO knew its employees were not following policies and condoned that practice. The only "knowledge" MCSO possessed was that the language line could not be accessed in the areas in which Maxis was housed.[5] (Crear Dep. 70, ECF No. 92-8.) Two employees, Amos and Berthelette, also testified that they did not receive training on how to use the language line or request a translator. (Amos Dep. 124, ECF No. 100-27; Berthelette Dep. 24, ECF No. 100-11.) But there is no evidence to show that MCSO was "aware of the risk" that this would have on Maxis, *Thomas*, 604 F.3d at 303, or that it was "patently obvious" that failure to train on the use of the language line would result in "unconstitutional consequences." *See Connick v. Thompson*, 563 U.S. 51, 63–64, 66–67 (2011); *see also Flores v. City of South Bend*, 997 F.3d 725, 732–33 (7th Cir. 2021) (failure-to-train liability is available when only a single violation of rights occurs, if the situation was "recurring" and presented an "obvious risk" of violating rights).

On the contrary, Major Crear testified that she was unaware of MCSO ever receiving any concerns or complaints about the inability to use the language line in

---

[5] Major Crear testified that she knew and that MCSO knew that the language line could not be used in those areas. But Defendants do not suggest that any individuals involved in the excessive-force incidents had this knowledge and, as a result, did not attempt to use the language line when interacting with Maxis. The Court judges the reasonableness of force "from the perspective and with the knowledge of the defendant officer." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 397). And even if the deputies did have such knowledge, they still could have made other efforts "to temper or to limit the use of force," such as arranging for a deputy who could translate. Indeed, Amos was explicitly told that Maxis spoke Haitian Creole and that there was a deputy who could translate. (ECF No. 100-8.) Accordingly, this does not change the analysis of the excessive-force claims.

the areas of the jail in which Maxis was housed, (Crear Dep. 70, ECF No. 92-8), and Defendant Amos stated that throughout his employment, he had never required a translator or used the language line because he "never felt that [he] needed one," (Amos Dep. 124, ECF No. 100-27). In other words, MCSO did not have reason to think that the limited availability of the language line was a problem, so it was not "deliberately indifferent to a known risk" that the practice would lead to constitutional violations. *Hall,* 953 F.3d at 950. That is different from CMS, which knew and accepted that the procedures it designed to prevent the specific risk of inmate suicide were being disregarded.

Even accepting Maxis's premise that "the jail staff Defendants repeatedly disregarded policies requiring that a warning be given before resorting to force" in the four incidents involving him, (Pl.'s Resp. 32, ECF No. 100), there is no evidence that MCSO "knew about and again permitted" or "condoned" those violations of policy. The disregard of policy in *Woodward* was "routine"; supervisors were specifically alerted to it and encouraged it. The same cannot be said for MCSO. There is simply insufficient evidence for a jury to find that MCSO had a policy or custom that caused Maxis's alleged constitutional violations. Therefore, MCSO is entitled to summary judgment on the *Monell* claims (Counts IX, X, XI).

## Conclusion

Defendants' Motion for Summary Judgment, (ECF No. 92), is **granted in part and denied in part**. The Motion is granted as to Counts I, II, III, IV, V, VI, IX, X, and XI; those claims are **dismissed with prejudice**. The Motion is denied as to the

excessive-force claim in Count VII and the failure-to-intervene claim in Count VIII. The Court requests that the Magistrate Judge meet with the parties to discuss settlement on the remaining claims.

    **SO ORDERED.**

Date: 3/24/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to registered parties of record via CM/ECF.